UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: ARCHITECT OF THE CAPITOL EMPLOYMENT DISPUTE<br><br>LEAD CASE: *Kraft v. Rexroat*<br><br>This Document Relates To:<br><br>ALL CASES | Misc. Action No. 24-mc-00032-TNM |

**CONSOLIDATED, AMENDED CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs Jonathan Kraft, Peter Bahm, Jason Baltimore, and William O'Donnell (collectively referred to as "Plaintiffs") bring this Complaint against Defendant Architect of the Capital ("AOC"), for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4311(a) ("USERRA"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. ("ADEA"), as applied by the Congressional Accountability Act of 1995 ("CAA"), as amended by the CAA 1995 Reform Act of 2018. 2 U.S.C. § 1311 *et seq*., when it terminated Plaintiffs.

**PROCEDURAL HISTORY**

The Plaintiffs each filed separate complaints against Defendant in the United States District Court for the District of Columbia. Kraft filed his Complaint on August 11, 2023 (Case No. 23-cv-2334-TNM). Defendant filed a motion to dismiss on December 11, 2023. Dkt. No. 11.

1

Kraft filed an opposition on January 3, 2024. Dkt. No. 14. Defendant filed a reply to this Opposition on January 9, 2024. Dkt. No. 15.

Bahm filed his complaint on August 21, 2023 (Case No. 1:23-cv-2423-TNM). Defendant filed a motion to dismiss on January 16, 2024. Dkt. No. 12. Bahm filed an opposition on January 30, 2024. Dkt. No. 13. Defendant filed its reply on February 6, 2024. Dkt. No. 14.

O'Donnell filed his complaint on October 5, 2023 (Case No. 1:23-cv-2973). Defendant filed a Motion to Dismiss on January 16, 2024. Dkt. No. 10. O'Donnell filed his Opposition to Motion to Dismiss on January 30, 2024. Dkt. No. 11. Defendant filed its reply on February 6, 2024. Dkt. No. 12.

Baltimore filed his complaint on October 16, 2023 (Case No. 1:23-cv-3068). Defendant filed its Motion to Dismiss on January 12, 2024. Dkt. No. 8. Baltimore filed his opposition on January 26, 2024. Dkt. No. 9. Defendant filed its reply on January 31, 2024. Dkt. No. 10.

The Court held a hearing for the motions to dismiss for Plaintiffs' cases on February 29, 2024, and decided to consolidate the four cases pursuant to Fed. R. Civ. P. 42. The case number for the consolidated cases is Misc. Action No. 24-mc-00032-TNM. The Court also gave leave to Plaintiffs to amend and consolidate the four cases into one complaint pursuant to Fed. R. Civ. P. 15(a)(2).

## **PARTIES**

*Plaintiff – Jonathan Kraft*

1. Jonathan Kraft is a 63-year-old white male who is domiciled in Annandale, Virginia.

2. The AOC employed Kraft as the chief financial officer.

3.  Kraft is an "employee" as defined by 42 U.S.C. § 2000e and a "covered employee" pursuant to the CAA at 2 U.S.C. § 1301(3)(F).

4.  Kraft served in the Army for 27 years, working mainly in financial roles, before retiring as a colonel.

*Plaintiff – Peter Bahm*

5.  Bahm is a 59-year-old white male domiciled in Alexandria, VA.

6.  Bahm was employed by the AOC as the chief of staff for the Architect of the Capitol.

7.  Bahm is an "employee" as defined by 42 U.S.C. § 2000e and a "covered employee" pursuant to the CAA at 2 U.S.C. § 1301(3)(F).

8.  Bahm served in the United States Air Force for 23 years, working mainly in facility operations and engineering roles, before retiring as a Lt. Colonel.

*Plaintiff – William O'Donnell*

9.  O'Donnell is a 59-year-old white male residing in Fairfax, VA. He served in the Navy for nine years before transitioning to be a civilian employee working for the Department of the Navy and Department of Defense work until 2019.

10. O'Donnell was employed by the AOC as the Chief Administrative Officer ("CAO").

11. O'Donnell is an "employee" as defined by 42 U.S.C. § 2000e and a "covered employee" pursuant to the CAA at 2 U.S.C. § 1301(3)(F).

*Plaintiff – Jason Baltimore*

12. Jason Baltimore is a 55-year-old black male residing in Murrieta, CA.

13. The AOC employed Baltimore as its general counsel.

14. Baltimore served in the Navy for 22 years, working mainly as an attorney, before retiring as a supervising attorney for the US Navy Judge Advocate General Corps.

15. Baltimore is an "employee" as defined by 42 U.S.C. § 2000e and a "covered employee" pursuant to the CAA at 2 U.S.C. § 1301(3)(F).

*Defendant Architect of the Capitol*

16. Defendant AOC is the federal agency responsible for the maintenance, operation, development, and preservation of the United States Capitol Complex, with its headquarters located at SB-15 U.S. Capitol, U.S. Capitol Building, Washington, DC 20515.

17. The AOC is an "employer" as defined by 42 U.S.C. § 2000e and an "employing office" pursuant to the CAA at 2 U.S.C. § 1301(9)(D).

**JURISDICTION AND VENUE**

18. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically Title VII, ADEA, and USERRA.

19. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the Defendants' headquarters are in this judicial district and the alleged violations took place in this judicial district.

**FACTUAL ALLEGATIONS**

*Plaintiffs' Employment with the AOC*

20. Bahm started working for AOC in or about 2010 as its director of construction. The AOC appointed Bahm to the position of acting chief of staff in September 2019 and then to the permanent position of chief of staff in 2021.

4

21. Jason Baltimore was appointed to the position of general counsel in September 24, 2012.

22. In his role Baltimore helped resolve legal matters, answered legal questions, and reviewed the legality of proposed AOC actions.

23. Baltimore met on a regular basis with Brett Blanton when he was the Architect, and he also met with Erin Courtney, the acting director of legislative affairs, in his capacity as general counsel.

24. As part of his general counsel duties and responsibilities Baltimore served as the Architect's principal spokesperson on legal matters before Congress, other agencies and the public and was in frequent communication with congressional staffers whose roles included providing funding appropriations for the AOC budget.

25. Kraft started working for AOC in 2018 as a senior rated (SES) budget officer after working for approximately five and a half years as the budget officer at the U.S. Secret Service. The AOC appointed Kraft to the position of acting CFO in 2019 and then to the permanent position of CFO in 2020.

26. Kraft managed the budget process as a part of his role as CFO. This included drafting the budget itself and preparing the Architect for congressional hearings regarding the budget.

27. Kraft met on a regular basis with Brett Blanton as well as Erin Courtney in his capacity as CFO. As part of his CFO duties and responsibilities Kraft served as the Architect's principal spokesperson on financial matters before Congress, other agencies and the public and was in frequent communication with congressional staffers whose roles included providing funding appropriations for the AOC budget.

28. O'Donnell started working for AOC in 2019 as the chief administrative officer ("CAO").

29. Tom Carroll was the acting Architect of the Capitol, and then Brett Blanton became the Architect of the Capitol. Chere Rexroat became the acting Architect of the Capitol after Blanton.

30. The Architect of the Capitol was the Plaintiffs' supervisor.

31. O'Donnell and Bahm met on a regular basis with Blanton as well as other members of the AOC executive cadre including Erin Courtney in his capacity as CAO.

32. As part of his CAO duties and responsibilities O'Donnell served as the Architect's principal administrator, overseeing logistical functions, information technology, Capitol Curator, and human resources, among other administrative duties.

33. As part of his chief of staff duties, Bahm provided executive support and advice to the Architect of the Capitol. Bahm also managed all administrative functions including policy formulation and implementation, business process improvement, and special projects.

34. Brett Blanton, the then Architect of the Capitol, was the direct supervisor for Kraft, Bahm, O'Donnell, and Baltimore.

35. Kraft, Bahm, Baltimore, and O'Donnell each performed well in their positions at AOC and had no disciplinary record.

36. Kraft, Bahm, Baltimore, and O'Donnell were all senior executive service ("SES") employees who were at the highest grade and level of responsibility that is possible for federal employees (beside political appointees).

*Christine Leonard's Role and Influence on Chere Rexroat's Decision to Fire the Plaintiffs.*

37. In November 2020, the AOC hired Christine Leonard as its director of legislative and public affairs (LPA).

38. The LPA director position is influential as it allows for one person to manage both public communications as well as communications with staffers for the Senate Committee on Rules & Administration and the House Committee on House Administration, which typically make decisions for, or give direction, the AOC that the Architect usually must follow. The director of legislative and public affairs meets daily with the Architect.

39. Courtney onboarded Leonard as the outgoing acting director and then became her direct report, resuming her permanent position as public affairs officer until she resigned in February 2021.

40. Leonard asked Courtney during the onboarding process why the AOC employed so many military veterans. Courtney replied that the Office of Personnel Management favors veterans in the hiring process and that many military veterans possess the prerequisite skills for many AOC positions.

41. Leonard also asked Courtney about Kraft, including whether Courtney believed Kraft was mentally "with it", negatively implying that due to Kraft's age, he could not perform his job. Courtney responded that Kraft occasionally neglected to add attachments to emails but that he was otherwise "with it." However, contrary to Courtney's implication that Kraft was somehow deficient in his duties, Kraft intentionally did not send certain documents to congressional oversight, at his discretion, as they were not ripe for review for Congress. Leonard then suggested that Courtney report Kraft to human resources, but Courtney declined to do so.

42. Leonard then told Courtney that she did not believe that Kraft had a positive working relationship with the appropriations staff members and that she wanted Kraft to stop speaking to them, implying that Kraft was intruding on her job.

43. Leonard regularly and critically pointed out to Courtney that she believed there were too many white male veterans in executive positions at the AOC after Courtney began reporting to Leonard.

44. Leonard also regularly complained to Mary Jean Pajak, the AOC's deputy chief of staff, about Kraft, Baltimore, and O'Donnell, criticizing their use of military language and opining that they engaged in "mansplaining" during work meetings.

45. During a meeting with Bahm and Blanton, Leonard subsequently asked Blanton to terminate Kraft,, but Blanton refused.

46. On or about February 13, 2023, the same day that Blanton was fired, Leonard asked Bahm to advise her as to which AOC employment positions served "at will" as opposed to being civil service. Bahm responded that all AOC executives served at the pleasure of the Architect. This conversation occurred while Leonard was answering questions from Senate Rules staff member Nichole Kotchwar.

47. Upon information and belief, Leonard circulated a list of executives to terminate and showed this list to others. The Plaintiffs were allegedly on this list.

***President Biden fired Blanton and Chere Rexroat became the Acting Architect***

48. On February 13, 2023, President Joe Biden fired Blanton over a series of ethical violations involving impersonating a police officer, appropriating a public vehicle for private purposes, giving private tours of the Capitol, among other violations.

49. Bahm, Kraft, and O'Donnell had no advance knowledge of most of these allegations and learned about them at the same time as the public.

50. Baltimore had no advance knowledge of most of these allegations and learned about them at the same time as the public.

51. Baltimore, as general counsel, had no responsibility over Blanton's use of his official vehicle and did not brief him on its use. Baltimore did not advise Blanton concerning his legal issues regarding the allegations laid out against him.

52. Bahm was also not responsible for Blanton's use of his official vehicle.

53. Although Kraft was the CFO, he did not have any control over the funds for Blanton's government car. Kraft's job required him to parcel out funds to the different fund managers across the AOC. Val Hasberry, chief of security, was responsible for the funds that were used to equip Blanton's government car (including lights, license plates, and other equipment). Blanton wanted his car to be equipped with "cold" licenses plates which would be untraceable in Department of Motor Vehicle databases, the AOC provided Blanton with these "cold" plates.

54. After deliberations with Congressional oversight staff, Chere Rexroat, the chief engineer, was named acting architect in or about February 2023.

55. In the weeks following her appointment as acting Architect, Rexroat significantly limited her interactions with Bahm, Kraft, and other members of the C-suite, except for Leonard—who she met with regularly. Bahm's office was in the immediate suite area with both Rexroat and Leonard, yet he was rarely able to speak with Rexroat.

56. On March 3, 2023, the Office of Inspector General published a memo stating that 17 AOC employees received knowledge of Blanton's violations from the General Services

Administration but failed to notify the Office of the Inspector General. Kraft was not implicated in this report. Bahm, O'Donnell, and Baltimore were falsely implicated in this report.

57. In or about March 2023, Rexroat offered Bahm a new temporary position as acting head of the Capitol Visitor Center. Bahm accepted the offer and was slated to begin on or about March 27, 2023.

58. On or about March 26, 2023, Rexroat advised Bahm that she was no longer appointing him as acting head of the Capitol Visitor Center. Rexroat did not provide an explanation.

59. In or about April of 2023, Leonard informed Susan Pell, executive director of the United States Botanic Gardens, that Baltimore had been giving Blanton legal advice in a personal capacity regarding his misuse of his government vehicle. In response, Pell corrected Leonard, explaining that Baltimore had not done so.

60. Upon information and belief, Leonard told Rexroat and the Senate staffers that Baltimore had improperly given Blanton legal advice related to his misuse of a government vehicle.

61. Rexroat tried to get the AOC's Office of Inspector General ("OIG") to investigate Baltimore for working remotely. The OIG declined to do so.

62. In early April, Rexroat asked the AOC's OIG to identify the 17 employees identified as having knowledge about Blanton's behavior. After the OIG complied with this request, Rexroat advised the OIG that she fired some of these employees, including Kraft, Bahm, O'Donnell, and Baltimore. Kraft was not one of the 17 employees named in the OIG report.

*AOC and Senate Staffers discriminate against Baltimore and subject him to a hostile workplace environment.*

63. The AOC general counsel typically represents the AOC in meetings with Senate Rules Committee staffers. Throughout Baltimore's time as general counsel, he was subject to hostile interactions with the Senate Rules Committee staffers, interactions that were never reported by white AOC executives. During these meetings, Baltimore was typically the only non-white person in the room. One staffer referred to Baltimore as "you people."

64. Multiple other AOC or AOC-affiliated staff recognized the staffers' specific distaste for Baltimore. Courtney opted to replace Baltimore in meetings with staffers to spare him the hostile interactions. An external counsel who frequently worked with AOC, named John Clifford, told Baltimore that he was concerned that Baltimore had been treated differently based on race, specifically by Senate Rules Counsel Wendy Smith.

65. In or about June 2022, the AOC allowed Baltimore to work remotely from his new home in Murrieta, CA so that he could care for his elderly in-laws.

66. Senate staffers argued in favor of Baltimore's removal due to his working remotely. However, two white AOC employees were allowed to work remotely.

*Rexroat terminated the Plaintiffs*

67. On April 6, 2023, Rexroat separately met with Kraft, Bahm, O'Donnell, and Baltimore and fired each of them.

68. During each of the Plaintiffs' termination, Rexroat advised the Plaintiff that she was terminating their employment, effective immediately. Rexroat also told the Plaintiffs that she would not tell them why she was doing so and that she did not need a reason because the Plaintiff served at the pleasure of the Architect.

69. Teresa Bailey, head of Human Resources, would normally be a part of the termination process, but she was not aware of Baltimore, O'Donnell, Kraft, and Bahm's terminations until after they had occurred.

70. As a result, Rexroat terminated four of the executive-level, veteran male members of the AOC C-Suite. Three out of the four men are white, all four are veterans, and all are over 40 years old.

71. By terminating Plaintiffs, Rexroat violated Government Accountability Office standards for internal controls as noted in the AOC's annual audit, which generated a Notice of Findings and Recommendations related to principle 4 – demonstrate a commitment to competence and principle 9 – identify, analyze, and respond to change in that she did not have contingency plans in place to address succession and contingency planning with regard to key positions within the Agency.

***Comparator Evidence and Intersectional Claims***

72. Four of the eight executives in the AOC C-suite were female executives who were not terminated, including chief security officer Val Hasberry, who had been implicated in the March 2023 OIG report.

73. The four females are appropriate comparators to the Plaintiffs as they were employed by the AOC; worked in the C-suite and were executive-level employees (thus working in the same or a comparable unit); had similar levels of responsibilities as it relates to job duties; had the same supervisor; had the ability to be disciplined by the same supervisor; and were bound to the same AOC policies, procedures, and disciplinary policies as Plaintiffs.

74. AOC treated these similarly situated female executives better than the Plaintiffs as it did not terminate these employees but did terminate the Plaintiffs.

75. The four female executives include: Mary Jean Pajak, who was the deputy chief of staff; Val Hasberry, chief of security; Christine Leonard, director of legislative and public affairs (LPA); and Patricia William, who was the chief safety officer.

76. Hasberry was implicated in Blanton's wrongdoing, but the AOC did not terminate her.

77. Pajak is a white female, over the age of forty, and is not a veteran.

78. Hasberry is a Black female, over the age of forty, and a veteran.

79. Leonard is a white female, over the age of forty, and is not a veteran.

80. Williams is an Asian American female who is over the age of forty and is not a veteran.

81. The Plaintiffs further allege that the AOC discriminated against them due to the intersectionality of their protected statuses, which is when people are discriminated against "on the basis of more than one trait or characteristic." Patrick Berning O'Neill, *"A Reasonably Comparable Evil": Expanding Intersectional Claims Under Title VII Using Existing Precedent*, 24 U. Pa. J. Const. L. 907 (2022).

82. The Plaintiffs are all older, male veterans. They experienced discrimination due to the intersectionality of their protected classes (age, gender, and veteran status).

83. Similar arguments about the intersectionality of protected classes can be seen in other cases. For instance, in *Wallace v. Skadden Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 385, the plaintiff alleged that she was discriminated against due to her race coupled with her marital status.

84. "Recognizing claims for 'intersectional' discrimination best effectuates congressional intent to prohibit discrimination based on stereotypes." *Frappied v. Affinity*

*Gaming Black Hawk, LLC,* 966 F.3d 1038, 1049 (10th Cir. 2020) (citing Kimberlé Crenshaw, *Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique of Antidiscrimination Doctrine, Feminist Theory and Antiracist Politics,* 1989 U. Chi. Legal F. 139, 150 (1989) (identifying mistaken assumption that "a discriminator treats all people within a race or sex category similarly")).

***Events that occurred after Plaintiffs' Termination***

85. After Rexroat fired the Plaintiffs, she sent an office-wide email stating that she fired them to improve the AOC's accountability.

86. Despite the Senate Rules Committee having previously barred acting Architect's from making staffing changes, acting Architect Rexroat was allowed to make significant changes to the very top of AOC, specifically to remove all of the male veterans from the executive staff.

87. Baltimore opted to resign in lieu of termination. Baltimore asked the AOC for severance pursuant to 5 U.S.C. § 5595 but was told he would not receive severance.

88. Bahm and Kraft were both terminated and requested severance, which the AOC denied.

89. In response to being advised of his termination, O'Donnell opted to retire, and subsequently his retirement date was set for May 31, 2023.

90. O'Donnell requested administrative leave until his retirement date as well as severance pay, both typical practices of AOC. However, AOC denied both requests, forcing O'Donnell to deplete his paid leave.

91. AOC did not give O'Donnell permission to host a retirement party. Instead, he and some co-workers briefly met at a bar to celebrate O'Donnell's retirement.

92. Rexroat tried to get the OIG to investigate O'Donnell for gift-related violations because of a planned retirement party that involved gifts for O'Donnell. The OIG declined.

93. The AOC terminated the Plaintiffs effective immediately. The AOC typically gives a six-month grace period for senior executives who are being terminated, the AOC puts these individuals into a "special assistant" status to ease the executive out of the organization. The AOC did not provide Plaintiffs with this option to be on "special assistant status."

***AOC leaked an email to the press that falsely implicated the Plaintiffs in Blanton's wrongdoing***

94. Later that day, a reporter for The Hill contacted Bahm for a comment on the articles they were about to publish about the four men's termination. The reporters advised that they were supplied a draft email that Rexroat would send to all AOC staff following the terminations. The email implied that O'Donnell, Bahm, Kraft, and Baltimore were implicated in Blanton's wrongdoing and jeopardized the AOC's accountability in partnership with Congress.

95. The AOC's public affairs office, headed by Leonard, as well as the Senate Rules Committee staffers who worked with her, leaked the email to the press before it was even sent out to its intended recipients.

96. Because of the leaked internal email falsely implicating Kraft, Bahm, Baltimore, and O'Donnell in Blanton's wrongdoing, The Hill and Roll Call published articles on or about April 7, 2023, unwittingly publishing false information about Plaintiffs and gravely damaging their reputations.

97. On or about April 27, 2023, Kraft and Bahm each received their SF-50s reflecting their termination, and the AOC reported that it terminated Kraft and Bahm due to misconduct.

98. Because of the falsity of the statement the AOC made in their SF-50s, Kraft and Bahm requested that AOC change their SF-50 to remove the misconduct allegation, which it eventually did on or about May 10, 2023, after being confronted by Kraft and Bahm.

99. As the result of AOC's illegal actions, Kraft, Bahm, Baltimore, and O'Donnell sustained mental anguish and economic damages, and they will continue to sustain damages into the future.

## COUNT I
### Discrimination Based on Gender
### Title VII of the Civil Rights Act of 1964
### 2 U.S.C. § 1311
### ALL CASES

100. Kraft, Bahm, Baltimore, and O'Donnell hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

101. Kraft, Bahm, Baltimore, and O'Donnell were "employees" as defined in 42 U.S.C. § 2000e(f) (Title VII).

102. Kraft, Bahm, Baltimore, and O'Donnell were "covered employees" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

103. The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

104. The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

105. The AOC violated Title VII, as incorporated with respect to the AOC by the Congressional Accountability Act (CAA), by discriminating against Kraft, Bahm, Baltimore, and O'Donnell, based on their sex (male), when it terminated their employment on April 6, 2023.

106. The AOC's stated reasons for terminating Kraft, Bahm, Baltimore, and O'Donnell are pretext for its unlawful sex discrimination.

107. Kraft, Bahm, Baltimore, and O'Donnell sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

### COUNT II
### USERRA
### 38 U.S.C. § 4311(a)
### Discrimination
### ALL CASES

108. Kraft, Bahm, Baltimore, and O'Donnell hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

109. Kraft performed service in the United States Army, Bahm performed service in the United States Air Force, and Baltimore and O'Donnell performed service in the Navy.

110. AOC was motivated by the fact that the Plaintiffs had served in the United States Army, Air Force, and Navy respectively, when it terminated their employment.

111. Kraft, Bahm, Baltimore, and O'Donnell lost a benefit of employment when AOC removed the Plaintiffs from federal service.

112. Kraft, Bahm, Baltimore, and O'Donnell former membership in a uniformed service of the United States was a substantial or motivating factor in AOC's decision to remove the Plaintiffs.

113. Kraft, Bahm, Baltimore, and O'Donnell sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

### COUNT III
### The Age Discrimination in Employment Act
### 29 U.S.C. §§ 621 et seq.
### Discrimination
### ALL CASES

114. Plaintiffs hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

115. Plaintiffs are over 40 years old.

116. The ADEA makes it unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).

117. AOC's decision to remove Plaintiffs was based on their age.

118. AOC's stated reasons for its action are pretextual.

119. Plaintiffs sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

## COUNT IV
### Discrimination Based on Race
### Title VII of the Civil Rights Act of 1964
### 2 U.S.C. § 1311
### BALTIMORE

120. Baltimore hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

121. Baltimore is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

122. Baltimore is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

123. The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

124. The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

125. The AOC illegally discriminated against Baltimore, based on his race, when it, through the Senate staffers, subjected Baltimore to a hostile work environment based on race, and when the AOC terminated his employment on April 6, 2023.

126. The AOC's stated reasons for terminating Baltimore are pretext for its unlawful race discrimination.

127. Baltimore sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully request that they be awarded the following relief against the AOC:

a. Reinstatement or, in lieu thereof, full front pay and benefits;

b. Economic damages for lost compensation and benefits and damages to Plaintiffs' career, reputation, and earning capacity in an amount to be determined;

c. Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

d. Injunctive and declaratory relief;

e. Reasonable costs and experts' and attorneys' fees;

f. Liquidated damages;

g. Any other such relief that a court may deem just and equitable.

Respectfully submitted,

*/s/ Anita M. Chambers*
Anita M. Chambers
R. Scott Oswald, DC 458859
Anita Mazumdar Chambers, DC 1046845
The Employment Law Group, P.C.
1717 K St NW, NW, STE 1110
Washington, DC  20006
(202) 261-2830
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
achambers@employmentlawgroup.com
*Counsel for Plaintiffs*