UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: ARCHITECT OF THE CAPITOL EMPLOYMENT DISPUTE<br><br>LEAD CASE: *Kraft v. Rexroat*, Case No. 1:23-cv-2334<br><br>This Document Relates To:<br><br>ALL CASES | Misc. Action No. 24-mc-32 (TNM) |

**MEMORANDUM ORDER**

Last spring, the Acting Architect of the Capitol fired every male executive on her staff. All four were veterans over the age of forty. Four other executives kept their jobs. But they were women, and three of them were not veterans. Sensing discrimination, the terminated executives sued the Acting Architect, Chere Rexroat. They claim she fired them based on their sex, veteran status, age, and—for one Plaintiff—race. Rexroat has moved to dismiss Plaintiffs' Amended Complaint. Because the race-based claim is not plausibly pled, the Court will dismiss it. But the others may proceed because Plaintiffs have done enough to take these claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**I.**

The Complaint frames the following facts, and the Court accepts them as true to evaluate Rexroat's Motion. *See Twombly*, 550 U.S. at 555. The Office of the Architect of the Capitol ("AOC") employs eight senior executive service ("SES") employees. Am. Compl. ¶ 72, ECF No. 6. Each Plaintiff here formerly held an SES-level job at the AOC. Jonathan Kraft was the Chief Financial Officer. *Id.* ¶ 2. Peter Bahm was the Chief of Staff. *Id.* ¶ 6. William O'Donnell

was the Chief Administrative Officer. *Id.* ¶ 10. And Jason Baltimore was the General Counsel. *Id.* ¶ 13. All Plaintiffs are male veterans over the age of forty. *Id.* ¶¶ 1, 4–5, 8–9, 12, 14. Baltimore is black; the others are all white. *Id.*

In many ways, this case began in November 2020 when the AOC hired a woman named Christine Leonard to serve as Director of Legislative Affairs. *Id.* ¶ 37. Plaintiffs allege this position carries great influence within the Office, and the person who fills this role "meets daily with the Architect." *Id.* ¶ 38. Immediately, Leonard asked her predecessor why the AOC "employed so many military veterans." *Id.* ¶ 40. And she asked whether Kraft was sufficiently "with it" mentally to carry out his job. *Id.* ¶ 41. Her criticisms continued as she settled into her new role. She "regularly and critically pointed out" that the AOC had "too many white male veterans in executive positions." *Id.* ¶ 43. She accused Kraft, Baltimore, and O'Donnell of "mansplaining" during meetings. *Id.* ¶ 44. And she even asked then-Architect Brett Blanton to fire Kraft, although he refused. *Id.* ¶ 45.

In February 2023, President Biden fired Blanton "over a series of ethical violations involving impersonating a police officer, appropriating a public vehicle for private purposes, [and] giving private tours of the Capitol." *Id.* ¶ 48. Upon Blanton's exit, Rexroat became the Acting Architect. *Id.* ¶ 29. Leonard then redoubled her campaign to get Plaintiffs fired. She "circulated a list of executives to terminate." *Id.* ¶ 47. And Plaintiffs allegedly appeared on this list. *Id.*

Rexroat quickly distanced herself from Plaintiffs. *Id.* ¶ 55. For instance, even though Bahm had an office in the same suite as Rexroat and Leonard, "he was rarely able to speak with Rexroat." *Id.* Not so for Leonard. She met "regularly" with Rexroat in the period just before Plaintiffs' terminations. *Id.*

2

In March 2023, the Office of the Inspector General ("OIG") published a memo implicating 17 AOC employees in Blanton's misconduct. *Id.* ¶ 56. Three Plaintiffs (Bahm, O'Donnell, and Baltimore) appeared on that list; Kraft did not. *Id.* Another SES-level employee named Val Hasberry also appeared on this list. *Id.* ¶ 72. At the time, Hasberry was the Chief of Security. *Id.* ¶ 75. She is a black female veteran over forty years old. *Id.* ¶ 78.

Shortly after OIG published this memo, Rexroat fired Plaintiffs. She met separately with each of them and told them that "she was terminating their employment, effective immediately." *Id.* ¶ 68. During these meetings, Rexroat did not reveal her reasoning. *Id.* She just told them that she needed no reason because they all "served at the pleasure of the Architect." *Id.* Although terminations are customarily routed through Teresa Bailey, the head of Human Resources, Rexroat never consulted her about Plaintiffs' terminations. *Id.* ¶ 69. And Rexroat lacked a contingency plan "to address succession," a failure that the Government Accountability Office flagged in its annual audit of the AOC. *Id.* ¶ 71.

Four SES-level employees remained at the AOC: Mary Jean Pajak (Deputy Chief of Staff); Val Hasberry (Chief of Security); Christine Leonard (Director of Legislative and Public Affairs); and Patricia Williams (Chief Safety Officer). *Id.* ¶ 75. All of them are females over forty. *Id.* ¶¶ 77–80. Pajak and Leonard are white, Hasberry is black, and Williams is Asian American. *Id.* Only Hasberry is a veteran. *Id.* ¶ 78.

Although Plaintiffs are represented by the same counsel, each sued Rexroat in a separate lawsuit. After briefing and argument on four distinct motions to dismiss, the Court consolidated the cases into this miscellaneous action and ordered Plaintiffs to file a joint Amended Complaint. *See* Consolidation Order, ECF No. 1. All of them now advance three claims: (1) sex discrimination, in violation of Title VII of the Civil Rights Act of 1964; (2) veteran

discrimination, in violation of the Uniformed Services Employment and Reemployment Rights Act; and (3) age discrimination, in violation of the Age Discrimination in Employment Act. Am. Compl. at 1, 16–18.[1] Baltimore adds a fourth claim: race discrimination, in violation of Title VII. *Id.* at 18–19.

Rexroat moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Def.'s Mot. Dismiss, ECF No. 7. That motion is now ripe.

## II.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* So the allegations, assumed true, must establish "more than a sheer possibility that [the] defendant has acted unlawfully." *Id.* A complaint is insufficient if it only offers labels and conclusions or naked assertions devoid of further factual enhancement. *See Middleton v. U.S. Dep't of Labor*, 318 F. Supp. 3d 81, 86 (D.D.C. 2018) (citing *Iqbal*, 556 U.S. at 678).

## III.

Plaintiffs have plausibly pled claims for sex, veteran, and age discrimination. But no factual allegations or reasonable inferences support Baltimore's race discrimination claim. So the Court will grant Rexroat's Motion on Baltimore's race discrimination claim and deny it for all others.

---

[1] The Court's page citations refer to the pagination automatically generated by CM/ECF.

## A.

Begin with Baltimore's race discrimination claim. In his view, Rexroat "illegally discriminated against [him], based on his race, when [she] . . . terminated his employment" with the AOC. Am. Compl. ¶ 125. Although Baltimore first pled a hostile work environment theory of discrimination, *see id.*, he expressly abandoned that theory in his Opposition. *See* Pls.' Opp'n at 22, ECF No. 8 ("Baltimore does not assert a hostile work environment claim in his Amended Complaint."); *cf. United States v. 8 Gilcrease Lane, Quincy, Fla. 32351*, 638 F.3d 297, 301 (D.C. Cir. 2011) (enforcing plaintiffs' "choice to withdraw their claims" where it "was free and deliberate"). So the only issue for the Court to decide is whether Baltimore plausibly pled a claim for race discrimination regarding his termination. He did not.

Baltimore's race discrimination claim arises under the Congressional Accountability Act of 1995 ("CAA"), which gives congressional employees rights coextensive with other federal antidiscrimination laws. *See* 2 U.S.C. § 1311(a) (explaining rights); *id.* § 1301(a)(3)(F) (covering AOC employees). Title VII's prohibition on race discrimination is one of those rights. Indeed, the CAA provides that "[a]ll personnel actions affecting covered employees shall be made free from any discrimination based on . . . race . . . within the meaning of section 703 of the Civil Rights Act of 1964." *Id.* § 1311(a)(1). Section 703, in turn, makes it unlawful for an employer to "discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

To avoid dismissal, Baltimore must "allege that he (1) suffered an adverse employment action (2) because of his race." *Jianqing Wu v. Special Couns., Inc.*, 54 F. Supp. 3d 48, 52 (D.D.C. 2014) (citing *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008)). But because Baltimore's claim is only at the pleading stage, he does not need to "plead the elements

of a *prima facie* case." *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014) (cleaned up). Still, Baltimore's allegations must permit the Court "to draw the reasonable inference that [Rexroat] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. They fall short.

Baltimore backs his race discrimination claim with two sets of allegations: "hostile interactions" with Senate staffers and criticisms about his remote-work arrangement. Am. Compl. ¶¶ 63–66. The hostilities allegedly happened in meetings Baltimore had with staffers on the Senate Rules Committee. *Id.* ¶ 63. Baltimore says he "was typically the only non-white person in the room." *Id.* And a staffer once referred to him as "you people." *Id.* The AOC also allowed Baltimore to work remotely. *Id.* ¶ 65. But that arrangement caused a stir: At some point, Senate staffers complained and Rexroat tried to get him investigated for being out of the office. *Id.* ¶¶ 61, 66. No investigation took place, so Baltimore continued to work remotely. *Id.* ¶ 61. Two white employees also worked remotely. *Id.* ¶ 66.

These allegations relate to Baltimore's hostile work environment claim, which he has abandoned. And none give rise to the inference that race discrimination motivated his termination. *See Iqbal*, 556 U.S. at 678. Baltimore never links the comments by Senate staffers to Rexroat's termination decision. And to be clear, these staffers did not work for the AOC. So their comments constitute, at most, "stray remarks by non-decisionmakers," which cannot serve as "direct evidence of discrimination." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020). Nor has Baltimore tried to link the remote-work criticism to his termination. In any event, it appears that criticism predated his termination by 10 months, *see* Am. Compl. ¶¶ 65, 67, so it is simply implausible that the former influenced the latter, *cf. Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (no causation in retaliation case with two-and-a-half-month gap between protected activity and adverse action).

6

In sum, the Amended Complaint "provides no facts that could possibly give rise to an inference that [Baltimore's termination] was due to intentional racial discrimination." *Jianqing Wu*, 54 F. Supp. 3d at 52.  So the Court will dismiss Count IV of the Amended Complaint for failure to state a claim.

**B.**

Plaintiffs' remaining claims fare better.  To carry their claims for sex, veteran, and age discrimination past the pleading stage, Plaintiffs must allege that they (1) suffered an adverse employment action (2) because of their sex, veteran status, and age.  *See Baloch*, 550 F.3d at 1196 (listing "essential elements" of sex and age discrimination); *Vahey v. Gen. Motors Co.*, 985 F. Supp. 2d 51, 58 (D.D.C. 2013) (similar for veteran discrimination).[2]  They do.

*First*, it is plausible that Leonard wanted Plaintiffs fired because they were older male veterans.  Once the AOC hired her, she asked "why the AOC employed so many military veterans."  Am. Compl. ¶ 40.  She even queried whether Kraft "was mentally 'with it,' negatively implying that" Kraft "could not perform his job" because of his age.  *Id.* ¶ 41.  And she also tried to report him "to human resources."  *Id.*  Meanwhile, Leonard "regularly" told her predecessor that "there were too many white male veterans in executive positions."  *Id.* ¶ 43.  She complained to another AOC executive that Kraft, Baltimore, and O'Donnell used too much "military language" and "mansplain[ed]" during meetings.  *Id.* ¶ 44.  And before the ethics scandal broke, she asked Blanton to fire Kraft.  *Id.* ¶ 45.

---

[2] As former congressional employees, Plaintiffs must route their discrimination claims through the CAA.  As with Baltimore's race discrimination claim, the CAA allows Plaintiffs to claim protection under Title VII (sex), the Age Discrimination in Employment Act (age), and the Uniformed Services Employment and Reemployment Rights Act (veteran).  *See* 2 U.S.C. § 1311(a) (incorporating protections against race, sex, and age discrimination); *id.* § 1316(a)(1) (same for veteran discrimination).

When Blanton lost his job, Leonard immediately asked Bahm which AOC employees served "at will." *Id.* ¶ 46.  Bahm responded that "all AOC executives served at the pleasure of the Architect." *Id.*  With this information in hand, Leonard allegedly typed up and circulated a list of executives ripe for termination—a list that included Plaintiffs. *Id.* ¶ 47.

Unlike the comments noted above relating to Baltimore's race, Leonard's actions are plausibly linked to Plaintiffs' terminations.  Around the same time of her comments, Leonard allegedly developed a close working relationship with Rexroat.  When Rexroat was elevated to Acting Architect, she and Leonard had offices in the same suite and met together regularly. *Id.* ¶ 55.  Although other executives—like Bahm—also had offices in that suite, Rexroat "significantly limited her interactions" with them.  *Id.*  Then when the OIG report dropped, Rexroat swiftly terminated Plaintiffs, saying only that they "served at the pleasure of the Architect."  *Id.* ¶ 68.  Later that day, Leonard leaked an email to the press implying that Plaintiffs were fired because they got tied up in Blanton's misdeeds.  *Id.* ¶¶ 94–95.

Leonard's statements and close connection to Rexroat provide circumstantial evidence of sex, age, and veteran discrimination.  Because the Court must "draw all inferences in [Plaintiffs'] favor," it will credit their portrayal of Leonard's statements at this time.  *Brown*, 774 F.3d at 1020 (cleaned up).  But if Plaintiffs wish to use these statements at summary judgment or trial, they will need facts proving "that [Rexroat] was the conduit of [Leonard's] discriminatory motives—her 'cat's paw.'"  *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (cleaned up).  Otherwise, her statements will likely carry little weight.  *See Waggel*, 957 F.3d at 1374 ("[S]tray remarks by non-decisionmakers are not generally direct evidence of discrimination.").

*Second*, the manner of Plaintiffs' terminations "gives rise to an inference of discrimination."  *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007).  In most cases, SES-

level terminations follow a certain protocol: the Architect flags the termination for the head of Human Resources, the executive is placed into "special assistant status" to ease him out of the organization, and the termination triggers a "succession and contingency plan[]" to keep the AOC fully operational. Am. Compl. ¶¶ 69, 71, 93. But none of this happened for Plaintiffs. Rexroat fired them without a word to HR. *Id.* ¶ 69. She offered none of them a "special assistant" step-down. *Id.* ¶ 93. And a GAO audit flagged Rexroat for terminating Plaintiffs without any "contingency plans in place to address succession." *Id.* ¶ 71. This alleged "failure to follow established procedures" raises the specter of discrimination. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008).

*Third*, Plaintiffs have comparators: the four female executives who kept their jobs. Am. Compl. ¶ 75. In a single day, Rexroat fired all the male executives and kept all the female ones. Although all the women were over forty, three of them were not veterans. *Id.* ¶¶ 76–80. Male or female, veteran or not, all eight executives had "similar levels of responsibilities as it relates to job duties." *Id.* ¶ 73. Comparisons like this are a classic form of circumstantial evidence in discrimination cases. *See Brady*, 520 F.3d at 495. But for the comparison to count, the difference in treatment must take place "in the same factual circumstances." *Id.*

Rexroat argues that the factual circumstances are different. She says Plaintiffs were implicated in Blanton's ethics scandal while the remaining executives were not. *See* Def.'s Mot. at 12–13. But Kraft "was *not* implicated" in the OIG report that listed "17 AOC employees" who had "knowledge of Blanton's violations." Am. Compl. ¶ 56 (emphasis added). So pinning the termination on the OIG report does not explain Kraft's termination. Nor does it explain why Hasberry stayed on the team; after all, she *was* named in the report. *Id.* ¶ 72. Rexroat tries to downplay Hasberry's role in the ethics episode. *See* Def.'s Reply at 8, ECF No. 10. But

Plaintiffs maintain that she was named in the report for a reason—she "was responsible for the funds that were used to equip Blanton's government car" that facilitated his wrongdoing.  Am. Compl. ¶ 53.  At any rate, the Court will not hash out factual disputes at the pleading stage.

Perhaps Rexroat's arguments will prove exculpatory.  Perhaps Plaintiffs will be unable to prove up their allegations.  But right now, Plaintiffs' allegations support "the reasonable inference that [Rexroat] is liable for the misconduct alleged" in Counts I, II, and III.  *Brown*, 774 F.3d at 1023 (quoting *Iqbal*, 556 U.S. at 678).  So the Court will deny Rexroat's Motion as to those counts.

## IV.

Baltimore has not plausibly pled a claim for race discrimination.  But all Plaintiffs (including Baltimore) have plausibly pled claims for sex, veteran, and age discrimination.  For these reasons, it is hereby

**ORDERED** that Defendant's [7] Motion to Dismiss the [6] Amended Complaint is GRANTED with respect to Count IV and DENIED with respect to Counts I, II, and III; and it is further

**ORDERED** that Defendant's Answer is due within 14 days of this Memorandum Order.

**SO ORDERED**.

Dated:  July 10, 2024                                                      TREVOR N. McFADDEN, U.S.D.J.